## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

Gary Hogan,

               Plaintiff,

     vs.

BMW of North America, LLC,

             Defendant.

Civil Case No.:

## <u>COMPLAINT</u>

For this Complaint, the Plaintiff Gary Hogan, by undersigned counsel, states as follows:

## <u>PRELIMINARY STATEMENT</u>

1.     This is an action by the purchaser of a vehicle distributed, warranted, and sold by the Defendant BMW of North America, LLC.

2.     Plaintiff purchased his BMW car with undisclosed defective engine (commonly referred to as "N63 engine") that burns an excessive amount of engine oil.  As a result, the car's N63 engine and other components are more likely to prematurely fail and need frequent replacement, the car is worth less money, and Plaintiff has had to spend time and money constantly dealing with the defect, including regularly adding quarts of oil to his car *in between* oil changes.

3.     In order to uncover the root of the problem and get a repair, Plaintiff presented his car to a BMW dealer.  BMW, however, claimed there was nothing wrong with N63 engine in Plaintiff's car and having to add quarts of oil *in between* oil changes was "normal."

4.     In truth, BMW knew all along the N63 engines were defective and concealed its knowledge from Plaintiff at the time of purchase and during each subsequent time when Plaintiff presented his car to BMW dealer complaining about engine oil consumption.

5.     Recently, the fact of BMW's knowledge of N63 engine oil consumption defects came to light in a similar case brought in the U.S. District Court for the Central District of California, *Zargarian v. BMW of North America, LLC, et al*, Case No. 2:18-cv-04857-RSWL-PLA (C.D. Cal. Aug. 27, 2019) (ECF #31-2), where plaintiff brought a motion to compel the deposition of a BMW engineer and to compel the further production of documents relating to BMW's knowledge of N63 engine defect.  There, plaintiff said:

> Plaintiff is in possession [sic] of many reports created by Mr. Murray that refer to N63 engine defects but were not produced in McDonald. Attached as **Exhibit 17** is a true and correct copy of such reports, with certain relevant portions highlighted [sic]. As one example, a 2013 report from Mr. Murray describes: "***Customer complains that the low engine oil level message appears while driving resulting in repeat visits [to] the dealer for top up.***" (Tabesh Reply Decl. Ex. 12 at 21.) On the same page, Mr. Murray identifies the problem to BMW of North America, LLC's parent company, BMW AG: "***AG - This is a growing problem this engine (N63T3). This is a severe customer annoyance causing unscheduled visits to the dealer for engine oil topping. Some situations have resulted in the repurchase of the vehicle.***" (*Id.*) Likewise, a 2010 report refers in its subject line to "***N63 Rough Running, Burnt Oil Smell, Crankcase Ventilation Hose Leaking Engine Oil or Vapor.***" (*Id.* at 1.) The report further describes an attachment, addressed to "AG," *i.e.*, BMW AG – BMW of North America's parent company in Germany, as follows: "***Attached is a zip file with Warranty Data, one file (unfiltered) contains 119 cases of the parts associated to this system being replaced for some failure. The 2nd file (filtered) contains 43 warranty claims where one of these parts was claimed for leaking.***" (*Id.* at 2.)

6.     Plaintiff seeks damages related to his vehicle's excessive consumption of engine oil and Defendant's failure to honor the terms of its warranty.

7.     The Plaintiff would not have purchased the vehicle had he been made aware of the vehicle's defective engine.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this matter pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2310(d)(1)(B), in that the Plaintiff claims more than $50,000.00 in damages, exclusive of interest and costs, and under the doctrine of supplemental jurisdiction as set forth in 28 U.S.C. § 1367.

9.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to the Plaintiff's claims occurred within this District; this District is where Defendant directs and controls warranty repairs on covered vehicles and this District is where Defendant made repeated misrepresentations to Plaintiff and where Defendant concealed certain material information from Plaintiff.

## PARTIES

10.     Plaintiff Gary Hogan is an adult individual residing in Tacoma, Washington.

11.     Defendant BMW of North America, LLC (hereafter "BMW") is a privately held Delaware limited liability company with its principle place of business located at 300 Chestnut Ridge Road, Woodcliff Lake, New Jersey.  BMW is a wholly owned subsidiary of BMW (US) Holding Corp.  BMW (US) Holding Corp. is a Delaware corporation with a principle place of business located in Woodcliff Lake, New Jersey.

12.     BMW was created in 1975 to act as the United States importer of BMW luxury and performance vehicles, which were traditionally manufactured in Munich, Germany.  At all relevant times, BMW was engaged in the business of importing, assembling, marketing, distributing, and warranting BMW automobiles in the State of Washington and throughout the United States.

3

13.     BMW sells BMW vehicles through a network of independently owned dealerships across the United States that are agents of BMW.

## FACTUAL ALLEGATIONS

14.     On or about September, 20, 2012, Plaintiff purchased a 2009 BMW 750i, Vehicle Identification Number WBAKA83549CY33773 (hereafter the "Vehicle") from BMW Seattle in Seattle, Washington, BMW's authorized dealer ("BMW Seattle").

15.     The total sales price for the Vehicle was $61,301.40 including options, fees, taxes, and other charges.

16.     Within a few months after purchasing the Vehicle, Plaintiff observed that it consumed an excessive amount of engine oil which required him to add one quart of oil about every 1,000 to 1,600 miles throughout the warranty period and well before the Defendant's recommended oil change intervals.

17.     During the warranty period, Plaintiff complained to BMW Seattle that the Vehicle consumed an excessive amount of engine oil.

18.     In response, BMW Seattle told Plaintiff such oil consumption was normal and did not offer any repairs to resolve the Vehicle's excessive oil consumption.

19.     As a result of the Vehicle's excessive consumption of engine oil, Plaintiff had to add engine oil to the Vehicle in between the Defendant's recommended oil change intervals in order to prevent the Vehicle's engine from failing.

20.     The cost to repair the Vehicle that involves an engine replacement ranges from $12,500.00 to $15,000.00.

21.     Plaintiff has spent approximately $132.00 in out-of-pocket costs associated with the Vehicle's excessive engine oil consumption.

22.    Defendant manufactured and placed into the stream of commerce the aforementioned Vehicle, which the Plaintiff subsequently purchased.

23.    Prior to purchasing the Vehicle, Plaintiff relied upon BMW's representations contained within Defendant's New Vehicle Limited Warranty that accompanied the sale of the Vehicle, including the representation that BMW would repair the Vehicle's engine; these representations were material to Plaintiff's decision to purchase the Vehicle.

24.    Specifically, under its New Vehicle Limited Warranty, Defendant promised to repair or replace components found to be defective in material or workmanship during the 4-year / 50,000-mile following such Vehicle delivery to consumer.

25.    BMW's authorized dealers expressly assented to perform warranty repairs on the Vehicle, necessary to bring BMW in compliance with its express warranty.

26.    In its New Vehicle Limited Warranty, BMW states:

**Warrantor**

BMW of North America, LLC (BMW NA) warrants 2011 U.S.-specification vehicles distributed by BMW NA or sold through the BMW NA European Delivery Program against defects in materials or workmanship to the first retail purchaser, and each subsequent purchaser.

**Warranty Period**

The warranty period is 48 months or 50,000 miles, whichever occurs first.

\* \* \*

**Warranty Coverage**

To obtain service under this warranty, the vehicle must be brought, upon discovery of a defect in material or workmanship, to the workshop of any authorized BMW center in the United States or Puerto Rico, during normal business hours. The BMW center will, without

charge for parts or labor, either repair or replace the defective part(s) using new or authorized remanufactured parts. The decision to repair or replace said part(s) is solely the prerogative of BMW NA. Parts for which replacements are made become the property of BMW NA.

In all cases, a reasonable time must be allowed for warranty repairs to be completed after the vehicle is received by the BMW center.

27.     BMW controls the execution of all warranty repairs by its dealers, as it provides training, materials, special tools, diagnostic software, and replacement parts to its dealers, and demands that the warranty repairs be performed in strict accordance with its repair guidelines, Technical Service Bulletins, and other instructions.

28.     In return, BMW pays its authorized dealerships monetary compensation for such warranty repairs.

29.     Therefore, BMW's authorized dealers are agents for the purpose of vehicle repairs, and knowledge of a defect reported to any such dealer can be imputed to BMW.

30.     Furthermore, Plaintiff is a third party beneficiary of contract(s) among BMW and BMW's authorized dealers.

31.     After purchasing the Vehicle, Plaintiff discovered that, unbeknownst to him, the Vehicle's engine contains a manufacturing defect which causes the Vehicle to consume engine oil at an extremely rapid rate.

32.     Moreover, Plaintiff discovered that as a result of the Vehicle's above-described defect, Plaintiff was required to regularly add additional engine oil to the Vehicle in between the Defendant's recommended oil change intervals in order to prevent the Vehicle's engine from failing and suffering from other related damage.

33.     In 2008, BMW introduced a new V8, twin-turbocharged engine, which BMW and enthusiasts refer to as the "N63."  This large, high-performance engine was designed to

be BMW's next generation V8 and was placed in certain BMW 5 Series, 6 Series, 7 Series, X5, and X6 vehicles from the 2009 through 2014 model years.

34.    Upon information and belief, the N63 engine was included on the V8 versions of the following BMW subject vehicles:

> F01 and F02 (7 Series Sedan) – produced from 3/2009 to 6/2012
> F04 (Active Hybrid 7) – produced from 4/2010 to 6/2012
> F07 (Gran Turismo) – produced from 9/2009 to 6/2012
> F10 (5 Series Sedan) – produced from 3/2010 to 7/2013
> F12 (6 Series Convertible) – produced from 3/2011 to 7/2012
> F13 (6 Series Coupe) – produced from 7/2011 to 7/2012
> E70 (X5) – produced from 3/2010 to 6/2013
> E71 (X6) – produced from 7/2008 to 6/2014
> E72 (ActiveHybrid X6) – produced from 9/2009 to 9/2011

35.    Plaintiff's Vehicle is equipped with the N63 engine.

36.    The N63 has become widely known and described as defective throughout the automotive industry and the BMW-enthusiast community.  It is widely recognized that N63 engines consume excessive amounts of engine oil and require frequent engine repairs, especially as compared to other, similar vehicles not containing N63 engines.

37.    Some owners and enthusiasts blame the oil consumption on BMW's decision to place the N63's twin-turbochargers between the cylinder heads, and inside of the engine V, rather than outside of the engine V, away from sensitive components, where turbochargers are typically located.

38.    N63 vehicles are notorious for consuming excessive amounts of engine oil and frequently need additional engine oil between scheduled oil changes to prevent catastrophic engine damage or failure.

39.    The oil consumption defect was particularly apparent in a recent Consumer Reports study on excessive oil consumption.  Consumer Reports studied 498,900 vehicles

across several makes and models for complaints about engine oil consumption and concluded that BMW's N63 engine was included on four out of the five most defective vehicles. (http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm.)

40.     The V8 version of the BMW 5 Series, which contained the N63 engine in 2011, 2012, and 2013 model years, was the worst performer in the study with 43 percent of vehicles needing an additional quart of oil between oil changes as of 2015. BMW's 6 Series and 7 Series, many of which contained the N63 engine, are the next worst performers. Finally, the V8 version of the X5 was the fifth worst performer in the study.

41.     The Consumer Reports study also shows that a greater percentage of defective models start to consume oil as they age.  This means that large numbers of N63 owners will begin to experience the oil consumption defect in the near future if they have not already.

42.     Many purchasers of vehicles containing the N63 engine have become upset about the excessive engine oil consumption – which was not disclosed by BMW in the product literature – and have posted internet complaints about specific frustrations and hassles caused by the oil consumption defect.

43.     For example, one N63 purchaser started a thread entitled, "Excessive oil consumption" on a BMW enthusiast website in November 2011:

> So I'm starting to get a little irritated at how much oil my 550 is burning. In the last 6k I've had to add 1 quart of oil three times.  In other words it is burning a quart every 2000 miles.  I've read about some people posting about having to add oil before but this much?? I've never owned a new car that burned any oil much less at this rate. Anyone else having this issue?  Oh btw the car has 9120 miles and I put 3100 in Europe during my ED.  When I was to have redelivery I had the dealer do an oil change and was gonna change the oil every 7.5k.

(http://www.bimmerfest.com/forums/showthread.php?t=581072.)

44.     A fellow BMW enthusiast responded with four separate links about the oil consumption issue and explained that the defect "was a hot topic back in September" 2011. (*Id.*)

45.     An Internet search of "N63 AND Burning Oil" reveals thousands of similar complaints regarding the oil consumption defect.[1]

46.     BMW had a duty to disclose the oil consumption defect and the associated out-of-pocket repair costs since the defect poses an unreasonable safety hazard, and because BMW had exclusive knowledge or access to material facts about N63 vehicles and engines, not known or reasonably discoverable by consumers. Defendant, however, failed to disclose the defect to consumers prior to or at the time of purchase or lease.

47.     The oil consumption defect has become so problematic that BMW has issued several technical service bulletins ("TSBs") to address complaints of excessive oil consumption and other problems related to the N63 engine.[2]

48.     With regard to the oil consumption issue, BMW issued the following TSBs:

NHTSA ID Number: 10046859

Service Bulletin Number: SIB-11-08-12
Summary: DUE TO DAMAGED SEAL RING, DURING ASSEMBLY, ENGINE OIL IS LEAKING FROM ENGINE OIL PUMP VOLUME CONTROL VALVE GASKET SEAL RING. MODELS E70, E71, F01, F02, F04, F07, F10, F12, F13. NO MODEL YEARS LISTED.

_____

NHTSA ID Number: 10045282
Service Bulletin Number: SIB-11-07-12

_____

[1]   *See, e.g.*, http://www.bimmerfest.com/forums/showthread.php?t=581072 (last visited Mar. 21, 2016); http://www.e90post.com/forums/showthread.php?t=874786 (last visited Mar. 21, 2016).

[2] TSBs are recommended repairs issued by automotive manufacturers and directed only to automotive dealers. TSBs are frequently issued when a manufacturer receives widespread reports of a particular problem with its vehicles.

> Summary: BMW: WHILE DRIVING VEHICLE, AT TIMES
> WOULD BE ROUGH RUNNING; WHITE OR BLUE SMOKE
> SEEN EXITING EXHAUST SYSTEM AND THE ENGINE OIL IS
> CONSUMED ABOVE SPECIFICATIONS.

49.   In June 2013, BMW issued SIB-11-01-13, which took the extraordinary step of changing engine oil consumption specifications for N63 vehicles, and specifically instructed service technicians to add two quarts of engine oil to N63 vehicles when the vehicles instruct owners to add only one additional quart of oil.

(http://www.xbimmers.com/forums/showthread.php?p=14449679.)

50.   Instead of addressing the underlying cause of excessive oil consumption in order to attempt to fix the defect, BMW recommended that its service technicians simply add more engine oil to respond to consumer complaints. Technicians were instructed to add two quarts of engine oil when the vehicle's electronic system specifically called for one additional quart and to also add an additional quart as the default fill on N63 vehicles. While BMW did not address the underlying problem, it likely reduced the number of complaints because the engine oil level in the subject vehicles would now be overfilled, a condition that can cause the engine oil to become aeriated, resulting in potential oil starvation and reduced oil pressure.

51.   Technical Service Bulletin SIB-11-03-13 appears to be part of a campaign to conceal the oil consumption defect and represent it as a normal feature of BMW vehicles. To this effect, BMW issued SIB-11-03-13, which upon information and belief includes the following:

> Service Bulletin Number: SIB-11-03-13
>
> Summary: All engines normally consume a certain amount of engine oil. This is necessary in order to properly lubricate the cylinder walls, pistons, piston rings, valves and turbocharger(s), if equipped. In addition, engines with less than 6,000 miles will generally consume additional engine oil because the internal engine components are not

fully seated (break-in). Therefore, engine oil consumption complaints received prior to 6,000 miles cannot be considered.

Once a new or remanufactured engine has accumulated 6,000 miles, oil consumption can be considered if there is a drastic change in the engine oil consumption rate (e.g., the engine oil consumption rate triples) under similar driving conditions.

Engines equipped with a turbocharger(s) will consume more engine oil than normally aspirated engines (non-turbocharged). The additional oil that is consumed in a turbocharged engine is mainly due to the turbocharger lubrication requirements. Some of the engine oil normally migrates past the turbocharger turbine bearing seals and will enter the intake tract of the engine.

All turbocharged engines also require a complex crankcase ventilation system. The crankcase ventilation system needs to maintain a small vacuum on the crankcase and not allow the crankcase to be pressurized. Pressurizing the engine crankcase can lead to external engine oil leaks and increased engine oil consumption via the piston rings and valve seals. When the load and the boost level of a turbocharged engine is varied, the path of the crankcase pressure is changed. During the crankcase ventilation path transition, a small amount of engine oil will pass through the crankcase ventilation system and is additionally consumed. The additional engine oil consumption of a turbocharged engine, as compared to a normally aspirated engine, is normal and not a defect.

Oil Consumption specification:
- All BMW engines (excluding Motorsport) can consume up to 1 quart of engine oil per 750 miles at any time.
- Due to the increased engine power, all Motorsport engines can consume up to 2.5 quarts of engine oil per 1,000 miles at any time.
Turbocharged Engines:
Engines that are fitted with a turbocharger(s) will consume more engine oil than naturally aspirated engines (non-turbocharged engines). In this case, a turbocharged engine could require topping of engine oil more frequently. For vehicles with N63 and N63T engines, refer to SIB-11-03-13 for additional details.

52.     BMW included every conceivable driving situation within this Service Bulletin as a factor for engine oil consumption so as to minimize their own responsibility and/or deflect blame onto consumers for the oil consumption defect. As can be seen from the TSBs,

Defendant continued to misrepresent to its customers that the rate of oil consumption in the N63 engines was normal and to be expected in engines that are fitted with turbochargers.

53.    BMW made these representations notwithstanding that the stated recommended oil service interval at the time of sale of the subject vehicles was the earlier of 15,000 miles or two years. Of course, at the rate of engine oil consumption referred to in BMW's service bulletin, the N63 vehicles would consume nearly 20 quarts of engine oil between the recommended 15,000-mile oil service intervals. Clearly, there is nothing normal or expected about this rate of oil consumption.

54.    Many N63 purchasers and automobile consumer advocates disagree that this level of engine oil consumption is normal and instead believe that it is excessive and well beyond normal.

55.    Consumer Reports offered its opinion of excessive oil consumption in the subtitle of its article: *Excessive oil consumption isn't normal: Automakers say adding oil between scheduled changes is acceptable. It's not.* (http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm.)

56.    Following hundreds of customer complaints about the oil consumption defect and other problems with N63 vehicles, BMW launched the "N63 Customer Care Package" (bulletin B001314) on December 29, 2014 (herein, "Customer Care Package"). The Customer Care Package consisted of several different measures, which merely mask, but do not correct, the serious design and/or manufacturing defects of the N63 engine including the oil consumption defect.

57.     The Customer Care Package instructed service representatives to check each covered vehicle's timing chain, fuel injectors, mass air flow sensors, crankcase vent lines, battery, engine vacuum pump, and low pressure fuel sensor, and replace if necessary. BMW instructed its service representatives to inspect and replace these components for free, even if no longer covered by the manufacturer's standard four-year/50,000 mile warranty.

58.     Also, BMW had long emphasized the fact that its vehicles can go long periods without service and sold many N63 vehicles with the promise of a two-year or 15,000 mile service interval. The Customer Care Package significantly reduced the mileage of its recommended engine oil change intervals for the subject vehicles. As a result, BMW reduced the oil change intervals from the earlier of 15,000/two years to the earlier of 10,000 miles or one year.

59.     BMW simultaneously launched the "N63 Customer Loyalty Offer" which offered purchasers discounts on new BMW vehicles to replace their defective N63 vehicles.

60.     BMW also launched a related "N63 Customer Appreciation Program," which authorized dealerships to provide purchasers with up to $50 of BMW merchandise or accessories.

61.     Engine oil is important because it functions as an essential lubricant for the moving parts in internal combustion engines. The oil creates a film separating surfaces of adjacent moving parts to minimize direct contact, thereby decreasing heat caused by friction and reducing wear. Engine oil also has important cleaning and sealing functions, and serves as an important medium for dissipating heat throughout the engine. As a result, the subject vehicles need the proper amount of engine oil in order for the engine and its related parts to function safely.

13

62.     As suggested by the N63 Customer Care Package, upon information and belief, the oil consumption defect impacts several components of N63 vehicles, either via combustion of excessive amounts of engine oil directly or by causing these components a lack of appropriate lubrication, which results in these components to prematurely fail and need frequent replacement.

63.     The oil consumption defect is a safety concern because it prevents the engine from maintaining the proper level of engine oil, and causes voluminous oil consumption that cannot be reasonably anticipated or predicted.  Therefore, this oil consumption defect is unreasonably dangerous because it can cause engine failure while the subject vehicles are in operation at any time and under any driving conditions or speeds, thereby exposing the Plaintiff, his passengers, and others who share the road with them to serious risk of accidents and injury.

64.     Plaintiff is informed and believes, and based thereon alleges that BMW acquired its knowledge of the oil consumption defect in 2008, if not before, through sources not available to Plaintiff, including but not limited to pre-release testing data, durability testing, early consumer complaints about the oil consumption defect to Defendant and its dealers, testing conducted in response to those complaints, aggregate data from BMW dealers, including dealer repair orders and high warranty reimbursement rates, as well as, from other internal sources.

65.     Defendant had a duty to disclose the oil consumption defect and the associated out-of-pocket repair costs to Plaintiff because the defect poses an unreasonable safety hazard, and because Defendant had exclusive knowledge or access to material facts about the Vehicle that were not known or reasonably discoverable by the Plaintiff. Defendant, however, failed to

disclose the Oil Consumption Defect to consumers such as Plaintiff prior to or at the time of purchase or lease of the subject vehicles.

66.     An engine that is starved of oil can seize up and cause the Vehicle to shut down when driven, thus creating for Plaintiff an unreasonably dangerous circumstance that may result in a crash.

67.     The oil consumption defect can be and has been enormously consequential to Plaintiff, burdening him with out-of-pocket expenses that would not be necessary but for such defect and depriving him of his original bargain.  First, excessive engine oil consumption requires additional service visits and increased maintenance costs due to the recently decreased oil change intervals, which the Plaintiff specifically sought to avoid by purchasing a high-end BMW Vehicle. Second, the oil consumption defect means that Plaintiff must be concerned with obtaining BMW-approved engine oil when needed.  If Plaintiff continues to drive without adding oil, the Vehicle might catastrophically fail and strand him or potentially cause a life-threatening accident.  This discourages Plaintiff from traveling long distances in his N63 Vehicle or forces him to carry an extra supply of oil.  Third, Plaintiff will suffer significant loss when he sells the Vehicle because the reputation of these vehicles has been impaired by now-public research establishing that these vehicles suffer from the oil consumption defect.

68.     Plaintiff provided Defendant or one or more of its authorized dealers with an opportunity to repair the problems with the Vehicle. The Defendant has neglected, failed, refused or otherwise been unable to repair the substantial impairments to the Vehicle within a reasonable amount of time or a reasonable number of attempts.

69.     The oil consumption defect experienced by the Plaintiff substantially impairs the use, value and safety of the Vehicle to the Plaintiff.

70.     The Plaintiff could not reasonably have discovered said nonconformities with the Vehicle prior to Plaintiff's acceptance of the Vehicle.

71.     The Plaintiff would not have purchased the Vehicle or would have paid significantly less for the Vehicle had he known, prior to the time of purchase, that he would be required to regularly purchase and add large volumes of engine oil to the Vehicle in order to prevent the Vehicle's engine from failing.

## TOLLING OF STATUTE OF LIMITATIONS

**I.     Fraudulent Concealment Tolling**

72.     Plaintiff did not and could not have known that there was an oil consumption defect with the Vehicle's engines at the time that he purchased the Vehicle or any time thereafter.

73.     The breach of warranties four-year statute of limitations, which might otherwise apply to bar some of the Plaintiff's claims, should be tolled because of Defendant's knowing and active concealment of the fact that the Vehicle's engine contains a defect.

74.     Defendant had a duty to disclose the oil consumption defect in the Plaintiff's Vehicle and had a duty to warn the Plaintiff, who will foreseeably drive the Vehicle, of those dangers, as an engine that is starved of oil can seize up and cause the Vehicle to shut down when driven, thus creating for Plaintiff an unreasonably dangerous circumstance that may result in a crash.

75.     While Defendant issued TSBs making clear it was aware that there was a defect with the Vehicle's engine, Defendant failed to disclose the existence of the defect to

Plaintiff at the time of the Vehicle sale and at the time Plaintiff presented the Vehicle to Defendant's authorized dealer for repair.

76.     Moreover, Defendant's authorized dealership informed Plaintiff that the Vehicle's excessive consumption of engine oil was normal, rather than the result of a defect.

77.     Defendant kept Plaintiff ignorant of vital information essential to the pursuit of his claims.

78.     Defendant knowingly, affirmatively, and actively concealed the Vehicle's defect from the Plaintiff.

79.     Defendant was aware of the defect with the Vehicle.

80.     Based upon the foregoing, Defendant is estopped from relying on any statutes of limitations in defense of this action.

**II.     Discovery Rule Tolling**

81.     Plaintiff could not have discovered through the exercise of reasonable diligence that the Vehicle contained the oil consumption defect within the time period of any applicable statutes of limitation.

82.     Plaintiff did not know the engine in the Vehicle was defective when he purchased the Vehicle.  Plaintiff did not and could not have known that the SIB-11-01-13 and the N63 Customer Care Package campaigns did not cure the oil consumption defect and left the Vehicle engine vulnerable to catastrophic failure in the course of its normal operation.

83.     Although Defendant launched the SIB-11-01-13 and the N63 Customer Care Package campaigns for the subject vehicles, the campaigns were limited in scope, and consumers were not informed that that the campaigns would not cure the oil consumption defect and remove the risk of subject vehicle engines being vulnerable to catastrophic failure in the course of its normal operation.

**III.     Estoppel**

84.     Defendant was under a continuous duty to disclose to the Plaintiff the true character, quality, and nature of the Vehicle.

85.     Defendant knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Vehicle from Plaintiff, and Defendant never intended to repair the oil consumption defect in the Vehicle.

86.     Based on the foregoing, Defendant is estopped from relying on any statutes of limitations in defense of this action.

**IV.     Class Action Tolling**

87.     The statutes of limitation applicable to Plaintiff's claims – including, without limitation, their breach of express warranty and implied warranty claims – have additionally been tolled by class action tolling in light of the *Bang v. BMW of North America, LLC* (Case No. 2:15-CV-6945) Complaint, filed September 18, 2015, and the Second Amended Complaint, filed in that case on March 21, 2016. *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350, 103 S. Ct. 2392, 2396 (1983) ("The filing of a class action tolls the statute of limitations 'as to all asserted members of the class'").

**FIRST CAUSE OF ACTION**
**Breach of Warranty Pursuant to the Magnuson-Moss**
**Warranty Act, 15 U.S.C. § 2301, *et seq.***

88.     The Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

89.     The Plaintiff is a "consumer" as defined in 15 U.S.C. § 2301(3).

90.     Defendant is a "supplier" and "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

91.     The Vehicle is a "consumer product" as defined in 15 U.S.C. § 2301(6).

92.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

93.     15 U.S.C. § 2304(a)(1) requires Defendant, as a warrantor, to remedy any defect, malfunction or nonconformance of the Vehicle within a reasonable time and without charge to the Plaintiff.

94.     Despite repeated demands, Defendant has failed to remedy the Vehicle's oil consumption defect within a reasonable time, and/or a reasonable number of attempts, thereby breaching the written warranty applicable to the Vehicle.

95.     As a result of Defendant's breach of written warranty, and Defendant's failure to remedy the same within a reasonable time and without charge to Plaintiff, Plaintiff has suffered damages.

### SECOND CAUSE OF ACTION
**Breach of Implied Warranty of Merchantability Pursuant to the Magnuson-Moss Federal Act, 15 U.S.C. § 2301,** *et seq.* **and Wash. Rev. Code § 62A.2-314**

96.     Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

97.     Defendant is a merchant with respect to motor vehicles.

98.     The Vehicle was subject to implied warranties of merchantability, as defined in 15 U.S.C. § 2308 and Wash. Rev. Code § 62A.2-314, running from the Defendant to the Plaintiff.

99.     An implied warranty that the Vehicle was merchantable arose by operation of law as part of the purchase of the Vehicle.

100.     Defendant breached the implied warranty of merchantability in that the Vehicle was not in merchantable condition when the Plaintiff purchased it, or at any time thereafter, and the Vehicle is unfit for the ordinary purposes for which such vehicles are used.

101.   Indeed, the Vehicle suffered from an oil consumption defect, which is a significant safety concern in that it prevents the Vehicle's engine from maintaining the proper level of engine oil, and causes voluminous oil consumption that cannot be reasonably anticipated or predicted. Therefore, the oil consumption defect is unreasonably dangerous because it can cause engine failure while the Vehicle is in operation at any time and under any driving conditions or speeds, thereby exposing the Vehicle's driver, passengers, and others who share the road with them, to serious risk of accidents and injury.

102.   Plaintiff notified Defendant of the defects in the Vehicle within a reasonable time after Plaintiff discovered them.

103.   As a result of Defendant's breaches of the implied warranty of merchantability, Plaintiff has suffered damages, including but not limited to incidental and consequential damages.

## THIRD CAUSE OF ACTION
### Breach of Express Warranties, Wash. Rev. Code § 62A.2-313

104.   Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

105.   In connection with the sale of the Vehicle to the Plaintiff, Defendant provided the Plaintiff with a New Vehicle Limited Warranty under which it agreed to repair original components found to be defective in material or workmanship under normal use and maintenance, including the Vehicle's engine.

106.   Plaintiff relied on Defendant's warranty when he agreed to purchase the Vehicle and Defendant's warranty was part of the basis of the bargain.

107.   Plaintiff submitted the Vehicle for warranty repairs as referenced herein. Defendant failed to comply with the terms of the express written warranty provided to the

Plaintiff, by failing to repair the Vehicle's defects within a reasonable period of time under the Vehicle's warranty as described herein.

108.    Plaintiff has given the Defendant reasonable opportunities to cure said defect, but Defendant has been unable to do so within a reasonable time.

109.    As a result of said nonconformities, the Plaintiff cannot reasonably rely on the Vehicle for the ordinary purpose of safe, comfortable and efficient transportation.

110.    The Plaintiff could not reasonably have discovered said nonconformities with the Vehicle prior to Plaintiff's acceptance of the Vehicle.

111.    The Plaintiff would not have purchased the Vehicle, or would have paid less for the Vehicle, had he known, prior to the respective time of purchase, that the Vehicle contained the defects identified herein.

112.    As a direct and proximate result of the failure of the Defendant to comply with its obligations under the express warranty, Plaintiff has suffered actual and consequential damages.  Such damages include, but are not limited to, the loss of the use and enjoyment of the Vehicle, and a diminution in the value of the Vehicle containing the defects identified herein.

**FOURTH CAUSE OF ACTION**
**Violation of the Washington Consumer Protection Act**
**Wash. Rev. Code Ann. § 19.86.010, *et seq.***

113.    The Plaintiff incorporates by reference all allegations contained in this Complaint as though fully stated herein.

114.    The Vehicle is "assets" under Wash. Rev. Code Ann. § 19.86.010(3) because it is tangible personal property that was purchased or leased for use.

115.    Plaintiff and Defendant are "persons" under Wash. Rev. Code Ann. § 19.86.010(1).

116.    Defendant engaged in a "trade" or "commerce" under Wash. Rev. Code Ann. § 19.86.010(2) by advertising, offering for sale, selling, leasing, and/or distributing the subject vehicles in the United States, including Washington, directly or indirectly affecting Washington citizens through that trade and commerce.  Further the subject vehicles are goods to be used primarily for personal, family or household purposes.

117.    The allegations set forth herein constitute false, misleading, or deceptive trade acts or practices in violation of the Washington Consumer Protection Act ("WCPA"), Wash. Rev. Code Ann. § 19.86.010, *et seq.*

118.    Specifically, and as alleged above, Defendant knew or should have known that the N63 engine had one or more defects that causes the Vehicle to be unable to properly utilize the engine oil and, in fact, to improperly burn off and/or consume abnormally high amounts of oil. The oil consumption defect decreases the lubrication available to engine parts, which results in premature failure. As a consequence, the oil consumption defect requires unreasonably frequent oil changes and/or the addition of oil between scheduled oil changes.

119.    The oil consumption defect also is a significant safety concern in that it prevents the Vehicle's engine from maintaining the proper level of engine oil, and causes voluminous oil consumption that cannot be reasonably anticipated or predicted. Therefore, the oil consumption defect is unreasonably dangerous because it can cause engine failure while the Vehicle is in operation at any time and under any driving conditions or speeds, thereby exposing the Vehicle's driver, passengers, and others who share the road with them, to serious risk of accidents and injury.

22

120.    Defendant acquired knowledge of the oil consumption defect prior to Plaintiff acquiring the Vehicle, through sources not available to consumers such as Plaintiff, including but not limited to pre-production and post-production testing data, early consumer complaints about the engine defect made directly to Defendant and its network of dealers, aggregate warranty data compiled from Defendant's network of dealers, testing conducted by Defendant in response to these complaints, as well as warranty repair and parts replacement data received by Defendant from Defendant's network of dealers, amongst other sources of internal information.

121.    While Defendant knew about the oil consumption defect, and its safety risks since mid-2008, if not before, Defendant nevertheless concealed and failed to disclose the defective nature of the Vehicle and its engine to Plaintiff at the time of purchase and thereafter.

122.    By failing to disclose and concealing the defective nature of the N63 engine from Plaintiff, Defendant violated the WCPA as it represented that the Vehicle and its engine had characteristics and benefits that it does not have, and represented that the Vehicle and its engine was of a particular standard, quality, or grade when it was of another.

123.    The facts concealed or not disclosed by Defendant to Plaintiff are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the Vehicle.

124.    Plaintiff relied to his detriment on those false, misleading, or deceptive acts or practices.

125.    Had Plaintiff known that the Vehicle and its engine was defective at the time of purchase, he would not have purchased the Vehicle.

126.    Those "false, misleading, or deceptive acts or practices" were a producing cause of the economic damages sustained by Plaintiff.

127.    Defendant's violations of the WCPA were made in connection with the purchase or lease of the Vehicle by Plaintiff.

128.    Plaintiff relied on Defendant to disclose material information it knew, such as the defective nature of the Vehicle equipped with the N63 engine, and not to induce him into transaction he would not have entered had the Defendant disclosed this information.

129.    Plaintiff has provided adequate notice to Defendant.

130.    Plaintiff should be awarded three times the amount of his economic damages under Wash. Rev. Code Ann. § 19.86.090 because Defendant intentionally and willfully concealed and failed to disclose the defective nature of the Vehicle, which created a risk of serious injury to Plaintiff and others.

### FIFTH CAUSE OF ACTION
**Fraudulent Concealment**

131.    Plaintiff incorporates by reference all of the above paragraphs of this Petition as though fully stated herein.

132.    Defendant concealed and suppressed material facts regarding the Vehicle – most importantly, the fact that it was equipped with defective N63 engine.

133.    Specifically, and as alleged above, Defendant knew or should have known that the N63 engine had one or more defects that causes the Vehicle to be unable to properly utilize the engine oil and, in fact, to improperly burn off and/or consume abnormally high amounts of oil. The oil consumption defect decreases the lubrication available to engine parts, which results in premature failure. As a consequence, the oil consumption defect requires unreasonably frequent oil changes and/or the addition of oil between scheduled oil changes.

134.    The oil consumption defect also is a significant safety concern in that it prevents the Vehicle's engine from maintaining the proper level of engine oil, and causes voluminous oil consumption that cannot be reasonably anticipated or predicted. Therefore, the oil consumption defect is unreasonably dangerous because it can cause engine failure while the Vehicle is in operation at any time and under any driving conditions or speeds, thereby exposing the Vehicle's driver, passengers, and others who share the road with them, to serious risk of accidents and injury.

135.    Defendant acquired knowledge of the oil consumption defect prior to Plaintiff acquiring the Vehicle, through sources not available to consumers such as Plaintiff, including but not limited to pre-production and post-production testing data, early consumer complaints about the engine defect made directly to Defendant and its network of dealers, aggregate warranty data compiled from Defendant's network of dealers, testing conducted by Defendant in response to these complaints, as well as warranty repair and parts replacement data received by Defendant from Defendant's network of dealers, amongst other sources of internal information.

136.    While Defendant knew about the oil consumption defect, and its safety risks since mid-2008, if not before, Defendant nevertheless concealed and failed to disclose the defective nature of the Vehicle and its engine to Plaintiff at the time of purchase and thereafter.

137.    Defendant had a duty to disclose such engine defect because it:

    a.  Had exclusive and/or far superior knowledge and access to the facts, and Defendant knew the facts were not known to or reasonably discoverable by the Plaintiff;

b.   Intentionally concealed the foregoing from the Plaintiff; and/or

c.   Made incomplete representations about the safety and reliability of the Vehicle, while purposefully withholding material facts from the Plaintiff that contradicted these representations.

138.   These omitted and concealed facts were material because they would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the Vehicle purchased by the Plaintiff.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.  Indeed, Plaintiff trusted Defendant not to sell Plaintiff a vehicle or not to place into a stream of commerce a vehicle that was defective or that violated federal law governing motor vehicle safety.

139.   Defendant concealed and suppressed these material facts in order to falsely assure purchasers and consumers that the subject vehicles were capable of performing safely as represented by Defendant and reasonably expected by consumers.

140.   Defendant actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Defendant money, and it did so at the expense of the Plaintiff.

141.   Plaintiff was unaware of these omitted material facts and would not have acted as he did if he had known of the concealed and/or suppressed facts.

142.   Because of the concealment and/or suppression of the facts, Plaintiff sustained damage because the Vehicle diminished in value as a result of Defendant's concealment of, and failure to timely disclose, the serious engine defect and the serious safety and quality issues caused by Defendant's conduct.

26

143.    Had Plaintiff been aware of the defective N63 engine installed in the Vehicle, and the Defendant's callous disregard for safety, Plaintiff would have paid less for the Vehicle or would not have purchased it at all.  Plaintiff did not receive the benefit of the bargain as a result of Defendant's fraudulent concealment.

144.    The value of the Vehicle has diminished as a result of Defendant's fraudulent concealment of the engine defect and made any reasonable consumer now reluctant to purchase any of the subject vehicles with N63 engine, let alone pay what otherwise would have been fair market value for such vehicles.

145.    Accordingly, Defendant is liable for Plaintiff's damages in an amount to be proven at trial.

146.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being, and with the aim of enriching Defendant.  Defendant's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct  in the future, which amount is to be determined according to proof.

## **DEMAND FOR RELIEF**

WHEREFORE, the Plaintiff demands judgment against Defendant as follows:

a.   An order approving revocation of acceptance or rescission of the purchase of the Vehicle;

b.   Money damages, in the form of a refund of the full contract price, including, trade-in allowance, taxes, fees, insurance premiums, interest, and costs, and a refund of all payments made by Plaintiff on the subject contract;

c.  Equitable relief including, but not limited to, replacement of the Vehicle with a new vehicle, or repair of the defective Vehicle with an extension of the express and implied warranties, and service contracts which are or were applicable to the Vehicle, in the event that Plaintiff is not found to be entitled to revocation;

d.  Incidental and consequential damages;

e.  Treble and punitive damages;

f.  Reasonable attorney's fees;

g.  Such other and further relief as this Court deems just and proper.

**TRIAL BY JURY DEMANDED ON ALL COUNTS**

Dated: January 20, 2020

Respectfully submitted,

By:  */s/ Sarah Stasch*
Sarah Stasch
STASCH LAW LLC
33530 First Way S, Suite 102
Federal Way, WA  98003
Phone:  (253) 237-0539
*Attorneys for Plaintiff*